**Case No. 13-4082**

# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

| | |
|---|---|
| WALTER L. WAGNER, ) | |
| ) | Case No. 13-4082 |
| Appellant and Plaintiff ) | |
| ) | (Dist No. 2:11cv00784; Utah) |
| vs. ) | |
| ) | **REPLY TO APPELLEE BRIEF** |
| PRESTON MICHIE, KENNETH ) | |
| FRANCIK, LESLIE COBOS, MARK ) | (Appeal from decision of US |
| ROBINSON, ANNETTE EMERSON ) | District Judge Robert J. Shelby) |
| STEVE BRYANT, WORLD BOTANICAL ) | |
| GARDENS, INC. (WBGI), ) | (Oral Argument Not Requested) |
| ) | |
| Appellees and Defendants ) | |
| ) | |

WALTER L. WAGNER, Appellant/Plaintiff
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

# TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES -   -   -   -   -   -   - iii

STATEMENT OF PRIOR OR RELATED CASES -   -   -   - vi

I   Statement of the Case Revisited   -   -   -   -   -   -   - 1

II   Misrepresentations of Fact   -   -   -   -   -   -   - 5

    A.   Nevada Case Misrepresentations of Fact   -   -   - 6

    B.   Hawaii Case Misrepresentations of Fact -   -   -   - 10

III   Rebuttal Argument   -   -   -   -   -   -   -   - 13

    A.   4-Prong 'Issue Preclusion' Test   -   -   -   -   - 14

    B.   4-Prong Test Application   -   -   -   -   -   - 19

       1.   Nevada Case   -   -   -   -   -   -   - 19

       2.   Hawaii Case   -   -   -   -   -   -   - 22

    C.   Material Issues of Fact Prohibit Summary Judgment -   - 24

IV   Conclusion -   -   -   -   -   -   -   -   -   - 27

## TABLE OF CASES AND AUTHORITIES

**Constitutional Provisions and Statutes**

*Federal Rules of Appellate Procedure* Rule 28.2(C)(1)  -  -      -      -      - vi

*Federal Rules of Civil Procedure* Rule 50(a)    -      -      -      -      -      - 25

*Federal Rules of Civil Procedure* Rule 56(a)    -      -      -      -      -      - 24

*Federal Rules of Civil Procedure* Rule 56(c)(4)      -      -      -      -      - 24

**United States Supreme Court Case Interpretations**

*Lawlor v. National Screen Service Corp.,* 349 U.S. 322,    -      -      -      - 17
75 S. Ct. 865, 99 L. Ed. 1122 (1955)

**Federal Appellate Court Case Interpretations**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-159 (1970)      -      -      - 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) -      -      -      - 25

*Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U. S. 731, 745 (1983)      - 25

*Bittner v. West Virginia-Pittsburgh Coal Co.,* 15 F.2d 652  -      -      -      - 18
(C.C.A. 4th Cir. 1926)

*Brady v. Southern R. Co.,* 320 U. S. 476, 479-480 (1943)      -      -      - 25

*Bush v. City of Philadelphia Police Dept.,* 684 F. Supp. 2d 634 -   -   - 17
(E.D. Pa. 2010)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)   -  -  -   - 25

*Clark-Cowlitz Joint Operating Agency v. F.E.R.C.,*  -  -  -  -   - 14
826 F.2d 1074 (D.C. Cir. 1987)

*In re Colony Beach and Tennis Club Ass'n, Inc.,* 423 B.R. 690 -   -   - 17
(Bankr. M.D. Fla. 2010)

*In re FedEx Ground Package System, Inc.,* 712 F. Supp. 2d 776 -   -   19, 23
(N.D. Ind. 2010)

*Wilkerson v. McCarthy,* 336 U. S. 53, 62 (1949)   -  -  -  -   - 25

## State Court Case Interpretations

*Arnevik v. University of Minnesota Bd. Of Regents*, -   -  -  -   - 17
642 N.W.2d 315, 163 Ed. Law Rep. 954 (Iowa 2002)

*Bremer v. Weeks*, 104 Haw. 43, 85 P.3d 150 (2004) -   -  -  -   - 14

*Brigham Young University v. Tremco Consultants, Inc.*,  -  -  -   - 15
2005 UT 19, 110 P.3d 678, 197 Ed. Law Rep. 835 (Utah, 2005)

*Faulkner v. Caledonia County Fair Ass'n*, 869 A.2d 103 (Vt. 2004)    - 19, 23

*Gudmundson v. Del Ozone*, 2010 UT 33, 232 P.3d 1059 (Utah 2010) -    - 16

*Jordan v. Stuart Creamery, Inc.*, 258 Iowa 1, 137 N.W.2d 259 (1965) -    - 18

*Mancuso v. Kinchla*, 60 Mass. App. Ct. 558, 806 N.E.2d 427 (2004) -    - 14

*People v. Moore*, 138 Ill.2d 162, 149 Ill. Dec. 278, 561 N.E.2d 648 (1990)    - 15

*People v. Ochoa*, 191 Cal. App. 4th 664, 2011 WL 9814 (2d Dist. 2011)   - 19, 23

*Richards v. Smith*, 9 Misc. 3d 670, 802 N.Y.S.2d 850 (Sup 2005)     - - 19, 23

iv

*Riemers v. Peters-Riemers*, 2004 N.D. 153, 684 N.W.2d 619 (N.D. 2004) -14,15

*Smallwood v. City and County of Honolulu*, 185 P.3d 887, 895 (2008)    - 19, 23

*Thornbrough v. Barnhart*, 232 Ark. 862, 340 S.W.2d 569 (1960) -    -    - 18

## Legal Encyclopedias

*American Jurisprudence 2d,* Judgments, section 464, -    -    -    -    - 14
*Statement of Doctrine*   IIIA

*American Jurisprudence 2d*, Judgments, section 465  IIIA -    -    -    - 15

*American Jurisprudence 2d*, Judgments, section 470  IIIA--    -    -    - 15

*American Jurisprudence 2d*, Judgments, section 473   IIIA -    -    -    - 16

*American Jurisprudence 2d*, Judgments, section 482   IIIA -    -    -    - 18

*American Jurisprudence 2d*, Judgments, section 493    IIIB-    -    -    19, 23

*American Jurisprudence 2d*, Judgments, section 498  IIIA -    -    -    - 18

## STATEMENT OF PRIOR OR RELATED CASES

Pursuant to Rule 28.2(C)(1) of the Federal Rules of Appellate Procedure, there are no current or past appellate cases, as asserted by appellee.

However, contrary to the blatantly false misrepresentation of Arnold Richer that "*no cases are known to counsel to be pending in this or any other court that will directly affect this Court's decision in the pending appeal*", the identical issues are currently pending in the US Bankruptcy Court, District of Utah, in an adversary proceeding initiated by Arnold Richer, entitled *WBGI v. Wagner*, A.P. No. 13-02099 (Bankruptcy No. 12-35494, *In Re Walter L. Wagner*).  In that adversary proceeding, Mr. Richer is seeking reinstatement of the Hawaii and Nevada "judgments" discussed herein, which were previously discharged in the bankruptcy proceeding.

In support of a motion for summary judgment filed by defendant therein Walter L. Wagner (Wagner), and to which Mr. Richer has responded, Wagner has raised the issues that the Hawaii and Nevada "judgments" were obtained by various frauds on the part of WBGI and its agents, which are the exact same frauds as discussed in appellant Wagner's *Opening Brief* and the instant brief.

In the event that the bankruptcy court judge grants the motion for summary judgment filed by Wagner, which motion is calendared for October 23, 2013, granting of the motion will effectively serve as the 'law of the case' in the instant matter, having a judicial determination that the "judgments" were obtained by fraud by Mr. Richer's now bankruptcy-liquidated client and its agents, the appellees herein.

In the event that the bankruptcy court denies the motion, in that such denial would likely be an appealable interlocutory order, Wagner would be filing an appeal therein that would be heard before this Court. Moreover, prevailing on the merits of that case reduces the damages amount owed to Wagner in this case by the dollar amount of the fraudulently obtained "judgments".

That motion before that bankruptcy court is exceptionally meritorious, and supported by affidavits of three parties (Wagner, Linda Wagner, Dan Perkins) detailing the numerous criminal and civil frauds of WBGI's agents, with the sworn, notarized affidavits in support attached hereto in the *Appendix* herein so that this Court can see the identity of issues. The motion is also supported by the requisite Notice of motion, as well as the requisite Memorandum of Law in support citing statutory and case authority in support of summary judgment. The motion also raises the issue that WBGI has become bankruptcy liquidated

and no longer exists as a legal fiction, and hence Mr. Richer no longer has
standing to appear in court on behalf of a liquidated corporation which cannot
transfer its alleged tort fraud claim

I

## Statement of the Case Revisited

The two "judgments" at issue herein arose when a concerned WBGI shareholder, Mr. Ron Tolman (Tolman) was alerted to the felony background of Ken Francik (Francik), and his illegal continuation of WBGI "governance" into 2005 without proper election.  Concerned that Francik was actually seeking to line his own pockets at the expense of the other 650+ WBGI shareholders (including Tolman) and that such actions could imperil WBGI and lead it into bankruptcy, with the approval of WBGI's Hawaii attorney he organized the Tolman Board and challenged Francik by freezing the corporate bank account.   Tolman and Francik then entered into a written settlement agreement (see *Opening Brief*) whereby they would mediate their differences and have a full election, with no WBGI monies to be spent on litigation of that governance dispute.  That election never happened, and instead, as soon as the frozen accounts were released back to the Francik Board, Francik removed and spent that money

[1]

to initiate litigation against Tolman in both Hawaii and Nevada, leading to the two fraudulently-obtained "judgments" referenced herein.[1]

Unfortunately, Tolman's fears were fully justified, and between 2005 and 2013 the Francik Board fully liquidated all of the WBGI land assets and bank accounts, reducing $10,000,000 of WBGI equity to $0.0 of equity in the process[2], and having the final bankruptcy liquidation occur on August 28, 2013 in Reno Nevada. This left the 650+ WBGI shareholders holding worthless share certificates.

In the course of those litigations, various frauds were worked by Francik, as discussed previously. Long after those litigations, the individually named appellees herein (who were also members of the Francik Board) continued to engage in defamatory actions against appellant to justify themselves to the WBGI shareholders. It is those subsequent defamatory actions that are complained of herein, some of which resulted in false and defamatory information about appellant on the internet, which resulted in loss of job opportunity when appellant sought to form new business enterprises and obtain other employment.

---

[1] Document 14, *Affidavit of Walter L. Wagner*, page 4

[2] *Appendix* herein, *Affidavit of Walter L. Wagner*, paragraphs 2-4

In appellee's "*Statement of the Case*" it is falsely asserted by Mr. Richer that the defamation claims herein pertain to general "misappropriation" of WBGI funds. In actuality it is the specific false allegation of outright theft of certain dedicated funds stolen by the Francik Board from the Visitor Center account that constitutes the substance of that defamation claim.[3] This was not a mere 'misappropriation' which could be a civil offense (such as poor decision-making on appropriations), but the crime of felony theft, as falsely alleged by appellee Michie in an email writing to Mr. Pratt, a WBGI shareholder. That felony theft was falsely attributed to appellant Wagner, rather than the Francik Board and its members that actually stole that money. They did so by cleaning out that dedicated Visitor Center bank account to be used for construction of a WBGI Visitor Center.[4]

Appellees defamed appellant by their false claim of the crime of felony theft. That actual defamation was the tip of the iceberg. It was part of a continuing conspiracy by the appellees herein to defame Wagner to the

---

[3] Document 2, *First Amended Complaint for Damages and Injunctive Relief*, Page 14-15, *COUNT IV- LIBEL*

[4] Document 58, *Affidavit of Walter L. Wagner*, paragraph 8

[3]

WBGI shareholders and others so that they might continue to delude the WBGI shareholders into believing that the appellees herein were working in the shareholders' best interests, all the while taking them to the cleaners.

It is further falsely asserted by Mr. Richer that the defamation was due to a falsely claimed fraudulent execution of a January 1, 2004 promissory note.    In fact, the defamation is due to the false claim that Wagner committed the specific felony of attempted theft and identity theft, and that he was a felon, which was placed on the WBGI website and disseminated on the internet.[5]    In fact the fraudulent indictment Francik obtained, based on his perjury, was dismissed by the State of Hawaii as having been obtained by Francik's fraud, but was nonetheless published to the WBGI shareholders as if it were valid felony claim against Wagner long after the dismissal (for at least a full year thereafter), and the false claims therein were also published via the news-media and on the internet following Francik's fraudulent promotion of them to the news-media.

That defamation claim also resulted in damages of a fraudulent civil "judgment" in that the Hawaii judiciary was swayed by that false felony

---

[5] Document 2, *First Amended Complaint for Damages and Injunctive Relief*, pages 16-23, COUNT V – SLANDER AND LIBEL

[4]

claim that was also fraudulently presented to the Hawaii news-media for the purpose of swaying that Hawaii trial court judge. The false defamation to the news-media worked its way onto the internet, leading to extensive loss of job opportunity, etc. A jury would certainly find that chronic false defamations to numerous parties could result in an undue influence on such a trial judge to curtail civil rights, as is what actually occurred. Further, those defamations that became available on the internet worked to interfere with appellant Wagner's business opportunities in Utah, as a jury would find based on the evidence showing such.

II

## Misrepresentations of Fact

Appellees' counsel Mr. Richer has misrepresented the facts of this case both to the trial court below, as well as to this court. The uncontested facts, of course, have been detailed in the *Opening Brief*. This includes the facts, detailed in numerous uncontested affidavits, that appellee WBGI and its agents (individual appellees herein) worked frauds on the courts in Hawaii and Nevada to obtain the two "judgments" relied on for alleged issue preclusion.

While Mr. Richer has presented a correct statement of the law pertaining to issue preclusion generally, including the four prongs required in order for it to be in effect, since the facts of the instant case clearly show issue preclusion to be inapplicable, appellees have misrepresented the facts to this court and the court below in order to make it appear as if the four prongs actually were satisfied.

A.   Nevada Case Misrepresentations of Fact

Specifically, in the Nevada case, Mr. Richer has represented to the trial court below, as well as to this court, that the Nevada case was about Wagner's falsely alleged "*removal from the board of directors*" (of WBGI)[6], as well as falsely alleged "*misappropriated funds*" and falsely alleged lack of "*proper records*".

However, the uncontested facts clearly show that the case in Nevada was entirely about whether the Tolman Board was properly in place, or the

_____

[6] Quoting from page 20 of the *Brief of Appellees* that quotes the trial court, who swallowed that misrepresentation as if true and used that to support his decision, quoting as follows:   *"[t]he Nevada court ultimately decided which of two competing boards of directors should control WBGI.  But to reach this decision, the Nevada court resolved a number of factual and legal issues, including whether Mr. Wagner misappropriated funds, whether he kept proper records, and whether his removal from the board of directors was proper."*

[6]

Francik Board. The lower court herein was simply confused about those facts, wrongly believing that the Nevada case was about Wagner's falsely alleged "removal", his falsely alleged "misappropriated funds" and falsely alleged lack of "proper records".

As shown in the uncontested facts filed in the trial court below, Wagner never litigated any alleged "removal", nor his record keeping, nor the falsely alleged misappropriation of funds.[7]   His witnesses to his appropriation of funds and record keeping (David Adams, Linda Wagner) were in Hawaii, expecting to testify as to those issues and the fraudulent damage claims pertaining thereto at the then-forthcoming Hawaii trial.

Since Wagner was never "removed" from the Francik Board, such falsely alleged "removal" also was never litigated. The trial court below simply invented a legal fiction that those issues were litigated in Nevada because of the *dicta* of the Nevada judge, and that they were somehow necessary to determine whether the Tolman Board or the Francik Board was the proper WBGI governance. The affidavits filed with the trial court

---

[7] See, for example, Document 33, uncontested *Sworn Affidavit of Walter L. Wagner*, page 22, top paragraph; see also *Appendix* herein, uncontested *Affidavit of Linda M. Wagner*, paragraphs 14-17.

are very clear about this, and the only litigated issue in Nevada was the propriety of the Tolman Board as the governance of WBGI versus the Francik Board.

The Tolman Board was properly appointed in 2005 by way of the WBGI By-Laws when the Francik Board refused to conduct 2005 elections as required. The Tolman Board appointment was reviewed and approved in writing by WBGI's long-time Honolulu attorney John Price. The issue before the Nevada court was about the propriety of the Tolman Board appointment, versus the propriety of the 2004 Francik Board's illegal continuation into 2005 without shareholder vote.[8] Unfortunately, the Nevada judge did a poor job of properly resolving that issue.

Wagner was never removed from either that 2005 Francik Board 'for cause' or any other reason, or from the Tolman Board. There was never an issue regarding his alleged removal, because he was not on the 2005 Francik Board and could accordingly not be removed from it. The allegation that he was "removed" is pure fiction, to attempt to make it

---

[8] See *Appendix* herein, uncontested *Affidavit of Walter L. Wagner*, paragraphs 5 and 15; see also Document 33, uncontested *Affidavit of Walter L. Wagner*, pages 6 to 8 (Section III).

[8]

appear as if there were facts pertaining to such alleged "removal" as a necessary part of the Nevada litigation. Since there was no removal action, any assertion of facts that were incidental to Wagner's falsely alleged poor record-keeping, falsely alleged misappropriation, etc. were merely incidental to the issue as to which board was the proper board, and not necessary in the least for that determination.

As Wagner was the former CEO of WBGI, the prior record-keeping for WBGI would have been by others anyway, such as the Secretary and the Treasurer (Linda Wagner), the Office Manager and Bookkeeper (David Adams) *et al.* and facts pertaining to Wagner's alleged "record-keeping" simply were not litigated in Nevada to make that determination.[9]

Wagner's falsely alleged 'misappropriation', 'poor record keeping', etc., issues never actually litigated in Nevada, were instead wholly irrelevant to the issue in Nevada as to the propriety of Ron Tolman's board being the proper WBGI board, properly appointed and approved in writing by WBGI's attorney; versus the propriety of the Francik board, that lined its pockets while liquidating WBGI assets and that led WBGI into bankruptcy-

---

[9] Document 33, uncontested *Affidavit of Walter L. Wagner*, page 22, top paragraph.

dissolution, being the proper board. Those issues of Wagner's supposed falsely alleged poor record-keeping, falsely alleged poor appropriation ("mis-appropriation"), etc. were to be litigated solely in Hawaii. In essence, allegations of fact found in the dicta of the trial court's judgment opinion, while they are purportedly used to support the opinion, cannot be used to support 'issue preclusion' as they were not actually litigated before that court.

## B.    Hawaii Case Misrepresentations of Fact

It is abundantly clear from the uncontested facts that Wagner did not actually have a trial in the Hawaii case. Nonetheless, appellees seek to assert that he had a "fair trial", and that the Hawaii issues of falsely alleged "misappropriation", etc. were actually litigated during an actual trial. The trial court below recognized that lack of a fair trial would preclude summary judgment, but apparently overlooked the fact that Linda Wagner (who was also a named party in that action) was a key witness for Wagner who had testimony pertaining to the WBGI books, record-keeping, appropriations, and all other facts showing that Francik's claims were false and fraudulent.

[10]

The trial court below wrongly tried to shift the blame for the lack of a fair trial to Wagner himself, wrongly contending that Wagner should have remained behind after Linda Wagner was removed from the courtroom to conduct a "trial" without his key witness; rather than go to the jailhouse to release her from the blatant false imprisonment and then return to the courthouse to continue with the trial, which is what actually occurred.[10]

In support of that contention in its *Brief of Appellees*, on the top of page 20 Mr. Richer asserts that (a) "liability" had already been determined "prior to the trial" (when in reality it had not, and any 'facts' that had been previously 'determined' could be modified/changed/corrected with the addition of actual facts at a valid trial); (b) Wagner himself was not prevented from appearing and therefore he got a "fair trial" even if his key witness was wrongly removed; (c) Wagner did not request a continuance, even though the uncontested facts show that the judge had already left the courtroom and there was no one from whom to request a continuance[11]; (d) Wagner had a proper appeal, even though the uncontested facts show that after two years on appeal, the appellate panel recused itself rather than

---

[10]  Document 14, *Affidavit of Walter L. Wagner*, paragraph 14

[11]  Document 14, *Affidavit of Walter L. Wagner*, paragraph 14

[11]

make a finding of criminal collusion between the trial court judge and his judge *pro tempore* serving as WBGI's counsel[12]; and (e) the arrest of Linda Wagner "*was entirely proper*" even though the uncontested facts show 1) her arrest at trial was obtained by perjured lying to a grand jury by Francik in order to obtain an indictment[13], and 2) that the trial judge did not avail himself of the opportunity to arrest her at a pre-trial hearing 10 days prior to the "trial" so as to allow her to attend the trial, but instead chose to wait until the "trial" itself so as to guarantee that she would not be able to testify.[14]

While this might be an "*entirely proper*" procedure for the "trials" conducted by *al qaeda* in Syria, it is an entirely improper procedure for American trials.

This court is simply being asked to recognize that there was not a valid trial in Hawaii whereby the issues herein sought for 'issue preclusion' would have been validly litigated.    It is quite obvious, based on the

---

[12]  *Appendix* herein, *Affidavit of Walter L. Wagner*, paragraph 13

[13]  Document 14, *Affidavit of Walter L. Wagner*, paragraphs 12-14

[14]  *Appendix* herein, uncontested *Affidavit of Linda M. Wagner*, paragraphs 3 to 8; *Appendix* herein, uncontested *Affidavit of Walter L. Wagner*, paragraphs 8 to 11; Document 14, uncontested *Affidavit of Walter L. Wagner*, paragraphs 12 to 15.

[12]

uncontested facts, that there was no such actual valid trial, and the issues purportedly 'resolved' by that prior action were not actually litigated in the least due to the criminal activity of defendant/appellee Francik and the collusion of that trial court judge with that criminal activity.

### III

### Rebuttal Argument

Since the trial court herein got the facts wrong on two critical elements; namely (1) his erroneous factual conclusion that the Nevada trial was about an alleged "removal" of Wagner when it was instead about Ron Tolman's ten-member board being the proper board and approved by WBGI's Hawaii legal counsel, versus the validity of Francik's asset-liquidating board that led WBGI into bankruptcy liquidation with only 10% shareholder approval (primarily themselves) of their board; and (2) his erroneous factual conclusion that Linda Wagner was merely eye-candy in the Hawaii case, and not a critical key witness and therefore her illegal removal at trial was of no consequence to there being a fair trial. As we see below, both of those factual errors on his part led him astray to wrong legal conclusions.

## A. 4-Prong 'Issue Preclusion' Test

Within the general doctrine of *res judicata*, there are two principal categories or branches: (1) claim preclusion also known as *res judicata*; and (2) issue preclusion also known as collateral estoppel.[15] Fundamentally under both *res judicata* and collateral estoppel, a <u>right, question or fact</u>, <u>distinctly put in issue</u> and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies.   The principle that one who has <u>actually litigated an issue</u> should not be allowed to re-litigate it underlies the rule of issue preclusion.[16]

Both *res judicata* and collateral estoppel serve the same purposes, which are to: a) promote judicial economy and finality[17]; b) prevent repetitive litigation or multiplicity of suits[18]; c) prevent inconsistent results[19];

---

[15] *Mancuso v. Kinchla*, 60 Mass. App. Ct. 558, 806 N.E.2d 427 (2004); see also *American Jurisprudence 2d*, Judgments, section 464, Statement of Doctrine.

[16] *Clark-Cowlitz Joint Operating Agency v. F.E.R.C.*, 826 F.2d 1074 (D.C. Cir. 1987)

[17] *Riemers v. Peters-Riemers*, 2004 N.D. 153, 684 N.W.2d 619 (N.D. 2004)

[18] *Bremer v. Weeks*, 104 Haw. 43, 85 P.3d 150 (2004)

[19] *Bremer v. Weeks, supra*

and d) increase certainty[20]. The doctrine of *res judicata* is a manifestation of the recognition that endless litigation leads to confusion or chaos. It reflects the refusal of the law to tolerate a multiplicity of litigation. The doctrine of *res judicata* is not absolute; a court should not adhere to the doctrine where its application would work an injustice.     Thus,   situations may arise which call for exceptions to the application of the doctrine, such as where the party against whom the earlier decision is asserted <u>did not have a full and fair opportunity to litigate the issue</u> in the earlier case[21], such as herein wherein appellant Wagner was denied actual trial litigation in Hawaii, and the issues were not actually litigated in Nevada.

For purposes of issue or claim preclusion, <u>courts resolve all doubts in favor of permitting parties to have their day in court on the merits of a controversy.</u>[22]   This general principle is readily applicable to the false claims by defendants/appellees herein that the issues were previously

---

[20] *Riemers v. Peters-Riemers, supra*; see also *American Jurisprudence 2d*, Judgments, section 465

[21] *People v. Moore*, 138 Ill.2d 162, 149 Ill. Dec. 278, 561 N.E.2d 648 (1990); see also *American Jurisprudence 2d*, Judgments, section 470

[22] *Brigham Young University v. Tremco Consultants, Inc.*, 2005 UT 19, 110 P.3d 678, 197 Ed. Law Rep. 835 (Utah, 2005)

litigated, when clearly they were not. The application of collateral estoppel is unwarranted in circumstances where its purposes would not be served, such as herein,[23] as it is manifestly obvious that the issues claimed to have been litigated actually were not, and through no fault of appellant.

Issue preclusion bars a party from re-litigating a matter that the party has already had the chance or opportunity to litigate.[24]  In this respect, the recently arisen issues of defamation based on oral defamations commencing in 2008 through to filing of the suit and thereafter, and the more recent (2011) e-mailings and web-site publications (2010-2011) of false defamatory material could not have been litigated in the prior suits as those suits were all concluded in early 2008 or prior, and based on alleged events from 2003 and earlier.

This effect on the limitation of operation was also again more recently announced, wherein it was held that the party asserting *res judicata* must show that the previous litigation involved an identity of (1) the thing sued

---

[23] *Gudmundson v. Del Ozone*, 2010 UT 33, 232 P.3d 1059 (Utah 2010)

[24] *American Jurisprudence 2d*, Judgments, section 473

[16]

for, (2) the cause of action, (3) the persons and parties, and (4) the quality of the capacity of the person for or against whom the claim is made.[25]

If the cause of action in the second action arises after the rendition of the judgment in the first action, it is a different cause of action not barred by the prior judgment.[26]   In the application of the doctrine of *res judicata*, courts sometimes consider the identity of facts essential to the maintenance of both actions, or whether the same evidence would sustain both.[27]   If the same facts or evidence would sustain both, the two actions are considered to be on the same cause of action, within the rule that the judgment in the former is a bar to the subsequent action.   It has been said that this method is the best and most accurate test as to whether a former judgment is a bar in subsequent proceedings between the same parties,

---

[25] *In re Colony and Tennis Club Ass'n, Inc.,* 423 B.R. 690 (Bankr. M.D. Fla. 2010); see also *Bush v. City of Philadelphia Police Dept.,* 684 F. Supp. 2d 634 (E.D. Pa. 2010)

[26] *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S. Ct. 865, 99 L. Ed. 1122 (1955)

[27] *Arnevik v. University of Minnesota Bd. Of Regents*, 642 N.W.2d 315, 163 Ed. Law Rep. 954 (Iowa 2002)

and it has even been described as infallible[28]. Of course, in applying this test, it is seen that about the only thing in common between the instant action, and the prior actions, is the commonality of WBGI as a party. The defamatory emails of summer 2011 had not occurred, the defamatory 2010-2011publication on the internet of the dismissed "indictment" had not occurred, and the substantive material of any of those defamatory actions were not known by plaintiff at the prior proceedings, nor discussed as factual matters at the prior proceedings. This is summarized below as follows:

> "*the judgment in the former action operates as an estoppel only*
> *as to matters which were necessarily involved and determined*
> *in the former action and is not conclusive as to matters which*
> *were immaterial or unessential to the determination of the prior*
> *action, were not issuable in the first action, were germane to,*
> *implied in, or essentially connected with, the actual issues in*
> *the case, or were not necessary to uphold the judgment.*"[29]

---

[28] *Bittner v. West Virginia-Pittsburgh Coal Co.,* 15 F.2d 652 (C.C.A. 4th Cir. 1926); *Thornbrough v. Barnhart,* 232 Ark. 862, 340 S.W.2d 569 (1960); *Jordan v. Stuart Creamery, Inc.,* 258 Iowa 1, 137 N.W.2d 259 (1965); see also *American Jurisprudence 2d,* Judgments, section 482

[29] *American Jurisprudence 2d*, Judgments, section 498

[18]

Consequently, this test shows that since the defamation actions are now entirely different, and could not have been litigated before they occurred, it does not meet this issue preclusion test.

## B.    4-Prong Test Application

Issue preclusion bars re-litigation of issues that satisfy the four-prong test:   If the issue(s) in the prior action(s) were (1) actually litigated; (2) actually and necessarily litigated; (3) actually litigated and determined in the original action; and (4) actually litigated, squarely addressed, and specifically decided[30], then issue preclusion might be operative.

### 1.    NEVADA CASE

In the instant matter, appellees assert that there was an 'identity of issues' in the Nevada case with the instant case by asserting that the Nevada case was about "Wagner's poor record-keeping".[31] However, as

_____

[30] *Faulkner v. Caledonia County Fair Ass'n*, 869 A.2d 103 (Vt. 2004); *Richards v. Smith*, 9 Misc. 3d 670, 802 N.Y.S.2d 850 (Sup 2005); *People v. Ochoa*, 191 Cal. App. 4th 664, 2011 WL 9814 (2d Dist. 2011); *In re FedEx Ground Package System, Inc.*, 712 F. Supp. 2d 776 (N.D. Ind. 2010); *Smallwood v. City and County of Honolulu*, 185 P.3d 887, 895 (2008), cited by appellee; see also *American Jurisprudence 2d*, Judgments, section 493

[31] *Brief of Appellees*, page 16, 2nd paragraph under '*Identity of Issues*'

shown in the uncontested sworn affidavits, Wagner was precluded from bringing witnesses who would have had testimony about WBGI's record-keeping. Wagner was CEO of WBGI the year prior to the Francik Board's 2005 tenure. If that were an issue before that court then Linda Wagner as the WBGI corporate Secretary and Treasurer, and David Adams as the WBGI office manager, would have been the parties responsible for that record-keeping[32]. The fact of the matter is that Wagner did not keep any records; they were instead kept by the WBGI Secretary/Treasurer and the WBGI office manager when Wagner was the WBGI CEO, and any reference to such alleged 'poor record keeping' in the Nevada case was simply tangential to, and not a necessary issue to be decided by that court to determine whether Ron Tolman had properly organized a Board of Directors in accordance with the WBGI By-Laws. It did not matter if Wagner kept the best records in the world, or if he kept no records, or sloppy records; the record keeping during the Wagner Board tenure (1995-2004) was not an issue before that Nevada court, and consequently was

---

[32] Appendix herein, *Affidavit of Linda M. Wagner*, page 2, paragraph 2 and page 11, paragraph 16; see also Document 33, *Affidavit of Walter L. Wagner*, page 15

[20]

not an issue necessary for that court to resolve to now allow issue preclusion based on the dicta pertaining thereto.

The issue before that Nevada court was solely to determine whether the Ron Tolman Board was properly constituted in 2005, or whether the Francik Board was properly constituted.   Unfortunately, that court was bamboozled by numerous extraneous matters and outright frauds and deceits, and allowed the corrupt Francik Board to resume control of the WBGI finances in 2007, leading WBGI to financial ruin and bankruptcy liquidation in 2013.  Had that court ruled properly on the governance issue, WBGI would now be a vibrant ongoing botanical garden.

Consequently, there was never an identity of issues between the instant defamation action of WBGI's agent Steve Bryant asserting that Wagner was the party who lost shareholder records during his tenure, when in fact no such records were ever lost during the Wagner Board tenancy (as per the uncontested facts)[33], and nothing even remotely similar was litigated in Nevada.  Accordingly, there was no identity of issues, issue

---

[33]  Document 33, *Affidavit of Walter L. Wagner*, page 16

preclusion is inoperable, and appellees' efforts to claim such is actually an effort to smear Wagner's name with Francik's lies.

### 2.    HAWAII CASE

Appellees seek to bootstrap their fraudulently obtained Hawaii "judgment" in which there was no actual litigation as both Wagner and Linda Wagner were unable to be present at the "trial" due to the criminal activity of Francik and the collusion of the trial court judge with that criminal activity.  The court below sought to get around that issue by declaring that Wagner nevertheless obtained a "*fair trial*" because only Wagner's wife was removed from the courtroom, not Wagner himself.  Apparently, the court below overlooked the fact, referenced in appellant Wagner's *Opening Brief*, that Wagner's wife was a critical key witness.   What the court below overlooked was Wagner's underlined sworn affidavit that asserted:

> "*…Linda Wagner was not simply accompanying me to the courtroom to hold my hand. **She was a critical key witness**, who had been listed in advance as a witness, as well as a party.  She had explicit testimony to give on the fraudulent assertions of "misappropriation" of WBGI funds, because she was the WBGI bookkeeper, accountant, and corporate Secretary and Treasurer during the times of question (1995-2003) regarding the advisability of those appropriations.  **Her***

[22]

***testimony was key to providing a complete picture...***"[34]
[***bold*** added for emphasis]

Accordingly, the court below overlooked or misread a key fact that erroneously led him to believe that Wagner obtained a fair trial. Absent any actual trial, due to the criminal activity of Francik causing the illegal removal of Wagner's key witness and Wagner leaving the courtroom immediately thereafter to bail her out, the issues in Hawaii were not litigated in the least, and again one of the four essential prongs of issue preclusion is absent, actual litigation and not a presumption of litigation, and issue preclusion is inapplicable with respect to the Hawaii "judgment".

Case law is very clear that there must have been an actual litigation of facts, and not merely a presumption of litigation.[35]

/////

/////

---

[34] Document 24, *Supplemental Affidavit of Walter L. Wagner,* pages 10-11

[35] *Faulkner v. Caledonia County Fair Ass'n*, 869 A.2d 103 (Vt. 2004); *Richards v. Smith*, 9 Misc. 3d 670, 802 N.Y.S.2d 850 (Sup 2005); *People v. Ochoa*, 191 Cal. App. 4th 664, 2011 WL 9814 (2d Dist. 2011); *In re FedEx Ground Package System, Inc.*, 712 F. Supp. 2d 776 (N.D. Ind. 2010); *Smallwood v. City and County of Honolulu*, 185 P.3d 887, 895 (2008), cited by appellees; see also *American Jurisprudence 2d*, Judgments, section 493

## C.   Material Issues of Fact Prohibit Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure (F.R.C.P.; Motion

for Summary Judgment or Partial Summary Judgment) reads that:

[a] "*party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.*"

The very mission of the summary judgment procedure is to pierce the

pleadings and to assess the proof in order to see whether there is a

genuine need for trial.

Rule 56(c)(4) of F.R.C.P. requires that an affidavit or declaration used

to support or oppose a motion must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated.

All of the affidavits filed herein in the court below would be admissible

in evidence, and the affiants are competent to testify on the matters as to

which they filed their affidavits.   There are no affidavits or other factual

evidence submitted by appellees in opposition to those affidavits, and the

facts provided by appellant's affiants are underlined uncontested facts.

[24]

In *Celotex Corp. v. Catrett,* the court held:

"*the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.*" [*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)]

The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)[36], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.[37] If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.[38]

The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.[39] In essence, though, the

---

[36] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)

[37] *Brady v. Southern R. Co.,* 320 U. S. 476, 479-480 (1943)

[38] *Wilkerson v. McCarthy,* 336 U. S. 53, 62 (1949)

[39] *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U. S. 731, 745, (1983)

inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.  The drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and <u>all justifiable inferences are to be drawn in his favor</u>.[40]

The trial court below made an effort to show that plaintiff/appellant Wagner's abundant affidavits showing great details of the claims were insufficient to negate the presumption of a "fair trial" in the Hawaii case.  He did this by asserting that since Wagner himself was not prevented from attending the "trial", albeit minus his chief witness removed due to the criminal activity of Ken Francik and the collusion of the Hawaii judge with that criminal activity, Wagner could not claim the case was not "actually litigated" within the meaning of the issue preclusion doctrine.  However, a reasonable jury would certainly find that removal of a key witness would prevent an

---

[40] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-159 (1970)

"actual litigation" of the issues, and that such removal did prevent a fair trial or any actual litigation of facts for issue preclusion purposes.

IV

## Conclusion

The uncontroverted facts presented to the trial court below show a chilling scenario of abuse of the court system by orchestrated frauds. They show that Ken Francik spent years perfecting his 'skill' of working frauds on trial courts, though eventually being caught, fired from the LAPD in 1995, and prosecuted for such felonies. A few years later in 1999 he acquired a small (1/2%) ownership interest in WBGI, and in 2005 began engaging in fraud as a WBGI board member.

In 2005 Ron Tolman, a WBGI shareholder and honorable Vietnam veteran still carrying shrapnel from his military-service years, challenged Francik's illegal holdover of WBGI governance without shareholder vote or approval. Francik responded by deceiving Tolman into releasing WBGI funds back to the Francik Board by promising in writing the monies would not be used for any litigation

[27]

between them, and then promptly stabbed him in the back by filing two suits, in Nevada and Hawaii, against Tolman and others (including plaintiff/appellant Wagner) with that money.

Francik then removed all of the money from the WBGI accounts, began a course of liquidating the WBGI land assets as well, and set WBGI on a course towards bankruptcy liquidation which occurred in August 2013, lining his own pockets and those of his close associates in the process.

Both lawsuits filed by Francik, guised as "WBGI", set forth fraudulent claims of 'wrongdoing' by plaintiff/appellant and his wife Linda Wagner during the decade that they founded and developed WBGI and served as the CEO/President and Secretary/Treasurer, respectively. Both lawsuits also set forth false claims that Ron Tolman and his ten-member board (incuding appellant Wagner herein), all WBGI shareholders, were not properly appointed, and asking for a determination that the Francik board was properly in governance of WBGI.

Because the two suits were identical and filed in two states (Hawaii and Nevada), the Hawaii judge restricted the Nevada suit to solely the governance issue, and the Hawaii suit to strictly the fraudulent claims of wrongdoing by the Wagners, et al.

Francik worked a fraud on appellant (and the court) during the Nevada suit. At the "trial", after previously having agreed with Mr. Tolman to limit the suit to solely the governance issue, Francik's attorney began presenting one of his fraudulent claims, that Wagner had been selling the company shares and embezzling the money. Wagner's witnesses pertaining to that fraudulent claim were in Hawaii, as they were not needed for the actual governance issue that was to be litigated, namely that the Tolman board was properly in place, not the Francik board. However, Francik presented his fraudulent claims of wrongdoing on Wagner's part, even though Wagner's abilities as the former CEO of WBGI were not an issue, and Wagner's witnesses were not present to adequately dispute that fraud, and it boiled down to Francik's word, proclaiming himself as a retired LA police officer (rather than fired and prosecuted, as was actually the case), against Wagner's truthful testimony.

[29]

Consequently, the trial court judge was bamboozled, and left Francik's board in governance of WBGI, while also wrongly issuing a monetary judgment notwithstanding the prior agreement that only the governance issue was to be litigated. That fraud of presenting a fraudulent monetary claim is now relied upon by appellees as 'litigated facts' when that claim of embezzlement and falsely alleged poor record-keeping was not litigated at all. Further, appellant Wagner was unaware that the non-governance issues were purporting to be litigated at the time because he was informed by Francik's attorneys that the issue was not being litigated. Those other matters were entirely incidental to the actual governance issue.

Francik then worked a fraud on the Hawaii court. That fraud was more extreme. Francik recognized that Linda Wagner was present in Hawaii, unlike in the Nevada case in which she had not appeared as she remained in Hawaii. He was aware that her testimony contradicted all of his fraudulent claims, so he sought to prevent her from testifying. To do this, he secretly appeared before a Hawaii grand jury and used his old LAPD dirty tricks of presenting perjured testimony. By this means he secretly obtained an arrest

[30]

warrant. Then, in collusion with the judge *pro tempore* (his attorney Tom Yeh) and the trial court judge, he secretly arranged to have Linda Wagner arrested in the courtroom when she appeared for the "trial", based entirely on Francik's perjured testimony.

This was successful, and Linda Wagner and appellant Wagner were both prevented from providing testimony, and the trial judge then issued a "judgment" based entirely on Francik's fraudulent testimony with no opposition.    No appeal was allowed, as the appellate panel recused themselves, refusing to criticize the trial judge for his collusion with Francik's felony conduct.  The trial judge had had an opportunity to arrest Linda Wagner ten days prior to the trial when she and appellant Wagner both appeared in person before him on a pre-trial motion, but he instead elected to arrest her at the "trial" to insure that his judge *pro tempore*, serving as Francik's attorney, would have no opposition.

The individual appellees, who were the members of the Francik board that supported Francik in those frauds, now seek to rely on those two "judgments" as having been validly obtained, not fraudulently obtained as is actually the case.  They have presented

[31]

not a single affidavit or other evidence to contradict the extensive evidence presented by appellant Wagner showing those frauds. Instead, they rely entirely on the naked, fraudulently obtained "judgments" to proclaim they are valid judgments. They then seek to use those judgments as alleged 'issue preclusion', contending that similar acts of defamation of the instant suit were previously litigated in those "judgment" suits, and accordingly appellant cannot now complain if they make false and defamatory statements about him nowadays, contending that they are in essence free to make any false and defamatory statements about appellant Wagner they choose.

Accordingly, they believe they may freely forever after proclaim Wagner to be a felon, based on the fraudulently obtained indictment that Francik obtained, and may freely proclaim as such forever after because Francik at one time obtained the indictment document, even though it was based upon his perjury. They also believe they may freely proclaim that Wagner was not keeping proper WBGI records, based upon both Francik's perjury in Nevada, as well as his perjury in Hawaii, and that they are forever free to proclaim as such without

[32]

consequence, even though the uncontested facts are directly contrary.

Appellant Wagner contends otherwise. He contends that since both judgments were obtained by frauds, and that the existence of those frauds has not been contested in the least, the "judgments" are *prima facie* no longer able to even begin to be contemplated to serve to support issue preclusion.

Further, appellant Wagner contends that since the issues herein arose long after the alleged "litigation" of the "judgment" documents, issue preclusion is also inapplicable. Specifically, the issue of whether Wagner committed a felony was litigated in the criminal case of *People of Hawaii v. Wagner*, and the uncontested facts clearly show the case was dismissed on the basis that no such felony ever occurred. Accordingly, not only did Wagner not commit any such felony, the uncontested facts herein show that it was Francik that committed the felony of perjury to falsely make it appear that Wagner had committed a felony. Issue preclusion thus operates to preclude *appellees* from proclaiming on the WBGI website and elsewhere that Wagner is a felon, and he thus may proceed forward to show his

[33]

damages (which are substantial) on the defamation claim he has presented. That false claim appellees published on their website was published for at least a full year after they were aware of the dismissal of Francik's false charge, yet they maintained that false impression to the WBGI shareholders solely to maintain their control over the WBGI finances, and not because it was true, which it was not.

Likewise appellee Michie's false claim that Wagner was the party that stole the Visitor Center funds was emailed to Louis Pratt in 2011. That was several years after the 2008 "judgment" "litigations" occurred. That email is but the tip of the iceberg, the one on which they got caught. Evidence at trial will show a massive defamation campaign on appellees' part. That theft of Visitor Center funds was not even known to Wagner at the time of those "litigations", so it could not have been litigated. Rather, appellees maintain that they are free to disparage Wagner with any claims of theft they seek to make, notwithstanding the lack of validity of their claims, because they obtained that Hawaii "judgment" wherein they precluded the Wagners from attending the "trial".

[34]

However, the <u>uncontested facts show it was Michie and his cohorts who stole that dedicated Visitor Center account money</u>, and that appellant Wagner was being framed for that theft, long after the fact, again in an effort to make the Francik board look as if they acted responsibly against Tolman, Wagner et al.; rather than being the crooks that they are for stealing the WBGI shareholders blind with their liquidation of WBGI assets, etc. under the noses of the courts and WBGI shareholders.

WHEREFORE, it is respectfully requested that this Court send this case back to the trial court, that it make a finding that the facts are uncontested as to the existence of damages, and that the trial should be solely to make a determination as to the amount of damages that should be awarded to plaintiff/apppellant Wagner.

DATED:   September 23, 2013

Walter L. Wagner

# APPENDIX

WALTER L. WAGNER
532 N 700 E
Payson, UT 84651
retlawdad@hotmail.com
808-443-6344

## IN THE UNITED STATES BANKRUPTCY COURT

## DISTRICT OF UTAH

--ooOoo--

| | |
|---|---|
| WORLD BOTANICAL GARDENS, )<br>INCORPORATED (WBGI), ) | Bankruptcy No. 12-35494<br>A.P. No. 13-02099 |
| ) | |
| Plaintiff ) | |
| ) | **AFFIDAVIT OF LINDA M.** |
| vs. ) | **WAGNER IN SUPPORT OF** |
| ) | **SUMMARY JUDGMENT** |
| WALTER L. WAGNER, ) | |
| ) | |
| Defendant ) | |
| _____) | |

## AFFIDAVIT OF LINDA M. WAGNER
## IN SUPPORT OF SUMMARY JUDGMENT

I, Linda M. Wagner, affirm state and declare under penalty of perjury of the laws of the State of Utah as follows:

1.      I am a licensed professional educator currently working in Utah County, Utah where I teach mathematics.

2.      In 2008 I was living in Hawaii where I also taught school.  Previously I had been involved with WBGI from 1995 to 2004, serving as a corporate officer.  My responsibilities as the WBGI Secretary and Treasurer involved handling and managing all of the books and records of the company, payment of all bills, etc.

3.      In 2005, WBGI initiated two lawsuits against Ron Tolman, who had challenged the legality of Mr. Ken Francik's continuation on the WBGI board when there had not been proper elections.  Mr. Tolman had previously entered into an agreement with Mr. Francik in April 2005 to resolve that, in which they agreed not to file any lawsuits regarding that dispute and instead to engage in mediation.  However, a few weeks later in June 2005 they initiated lawsuits anyway, one in Hawaii first, and a few weeks later an identical one in Nevada. Both of those lawsuits named me, my husband Walter Wagner, Ron Tolman, and several others who had joined the Ron Tolman board, and both lawsuits sought a declaration that the Ken Francik board was properly constituted, and both

2

lawsuits sought monetary claims of various alleged wrong-doings on the part of the original corporate officers (myself and my husband, who had founded the company in 1995).

3.      The Hawaii case was supposed to come to trial about April, 2008. However, there was not actually a trial, nor was there an appeal allowed, even though the judge issued a 'trial' judgment. I say this because I went to the judge's courtroom for a trial at the appointed time, where I was the chief witness, but instead of having a trial, the judge arrested me and removed me from his courtroom, preventing me from providing any of my testimony pertaining to the books and records of WBGI during the time I had served as the WBGI corporate officer.

4.      What was peculiar about this was that I had been standing before that same judge just ten days earlier at a pre-trial conference. I found out later that he was holding an arrest warrant for me, but he made no mention of that fact at that pre-trial hearing. I also found out later that he had signed that warrant six weeks before then, back in February of 2008. If he had wanted to arrest me, then he should have arrested me then, not when I showed up for trial.

5.      What was also peculiar about this was that I had done nothing illegal. The criminal charge used for that arrest warrant was subsequently dismissed. There

3

was never any truth to any of the criminal charge. In essence, I was charged with misrepresenting my status as a WBGI corporate officer. As I subsequently learned, Ken Francik had given false testimony to a grand jury in order to get that arrest warrant issued, and he had also worked with the trial judge to have me arrested at the beginning of the trial. Apparently, he did not want me to testify about the truth.

6.    I had entered the courtroom fully expecting a trial to take place. The first witness (Mr. Francik) was on the witness stand when the judge (Mr. Nakamura) stood up and announced that he was taking a quick break, and left the courtroom. At the same time, the rear courtroom doors opened and several Sheriff's entered and began walking towards me, placed me under arrest, and escorted me from the courtroom. I spent the next several hours at the jailhouse, while my husband (Walter Wagner) made arrangements to post the high bail that Mr. Nakamura had set. I was released mid-afternoon, and my husband then went back to the courtroom, but the "trial" had ended without my testimony or my husband's testimony. Had Mr. Nakamura wanted to actually conduct a fair trial, he had several options open to him: 1) I should have been arrested when I was first before Mr. Nakamura with him holding a warrant, which was 10 days before the trial; or 2) I should have been arrested after the trial had concluded later that day; or 3) I should have been arrested, but directed to remain in the

4

courtroom until after the trial and then escorted to the jailhouse; or 4) I should have been arrested but released on my own recognizance. I should NOT have been arrested at the start of the trial, escorted from the courtroom, and kept from providing my testimony that showed all of the charges were utterly bogus.

7.    The false criminal charge should have been known to Mr. Francik that it was false. He told that grand jury that I had been replaced as WBGI's corporate officer in 2003 by one Annette Emerson. He then claimed that a Promissory Note that I signed on January 1, 2004 was therefore a fraudulent attempt to take WBGI's money. That replacement by Ms. Emerson did not happen then (2003), but rather in September 2004. In February 2004 I was replaced as the Treasurer by Dan Perkins, but continued on as the WBGI corporate Secretary until September 2004. All of the company records, both with the Secretary of State in Nevada as well as internally showed that I was a WBGI corporate officer during that time. Moreover, the board that included Ken Francik had asked me to sign a corporate officer resolution for land acquisition (as I had done in earlier years) in June 2004, which I did. WBGI's attorney had hand-delivered a letter to Mr. Francik around May 2004 clarifying the legal status of WBGI, including the fact that I was the WBGI Secretary and Mr. Perkins was the WBGI Treasurer. While I was training Ms. Emerson on the WBGI computer system in early 2004, this was done in anticipation that she would become the Treasurer later that year.

5

Neither she, nor anyone else, ever asserted that I had been relieved of my duties as a corporate officer, and I was instead being asked to continue in those duties (as for example, being asked by the Ken Francik board to sign a corporate resolution for land acquisition). I was dumbfounded to learn that, several years after the fact, Mr. Francik was presenting false testimony to a grand jury claiming I had been replaced in 2003 by Ms. Emerson. Nothing of the sort ever happened. This appears to have been done solely because Mr. Tolman had challenged Mr. Francik, and it went to court.

8.     I had expected to testify at that "trial", which wasn't actually a trial because only one side was presented. My testimony was critical, because I had served as the WBGI corporate officer during all of the time in question and had paid all of the WBGI bills and maintained all of the WBGI records in the WBGI office that was located at my residence until June 2004.

9.     Had I been allowed to testify, I would have shown the falsity of the civil claims, and that there had been no fraud on the part of Walter Wagner (or myself) as follows:

a)     the false claim that the agreement to pay rent for Walter Wagner's lodging was a fraud, because it was a lawful contract for a legitimate purpose, allowable by rules governing corporations, and was a part of his compensation

6

package, allowed because 1) he was not receiving any of his monetary compensation (pay), and 2) he was using the rented location as both the WBGI office, as well as the WBGI nursery and tool-storage area (to prevent theft), and the agreement was approved by the WBGI board for many years;

b)      the false claim that the agreement to pay medical insurance for the Wagner family was a fraud, because it was a lawful contract for a legitimate purpose as a part of his compensation package, and required by Hawaii State Law for health insurance for employees, and was approved by the WBGI board for many years;

c)      the false claim that payment of attorney fees for a Hawaii attorney to settle a contract dispute involving WBGI  was a fraud, because it was a lawful contract for a legitimate attorney-approved purpose and did not enrich either of the Wagners personally, and was approved by the WBGI board;

d)      the false claim that payment of attorney fees for a California attorney to ward off a potential false civil suit was a fraud, because it was a lawful contract for a legitimate attorney-approved purpose and did not enrich either of the Wagners personally, and was approved by the WBGI board;

7

e)      the false claim that payment of a small portion of Walter Wagner's earned monetary compensation was a fraud, because it was a lawful contract to pay him monetary compensation for services performed, and was approved by the WBGI board;

f)      the false claim that payment of credit cards in Walter Wagner's name was a fraud, because those credit cards had been borrowed by WBGI from Wagner pursuant to a lawful contract, expenses charged to the cards were for legitimate WBGI purposes such as payment of WBGI advertising bills, payment of WBGI purchase, and the payments made thereon by WBGI did not exceed the amount WBGI borrowed (it fell short by about $70,000), and the contract was approved by the WBGI board;

g)      the false claim that the sale of Walter Wagner's personal shares in WBGI was a fraud, because Walter Wagner sold only his own shares and not corporate treasury shares as was falsely reported by Mr. Francik, and the sale was approved by the WBGI board; further, the false claim was made by Mr. Francik that Walter Wagner pocketed that money, when in fact it was donated to WBGI, though administered by myself instead of by Mr. Francik by way of purchasing materials and payments for supplemental labor, etc.

h) all other claims that were presented were not frauds, because the expenditures were for legitimate WBGI purposes, and were approved by the WBGI board.

10. In essence, my testimony, had I been allowed to testify, would have shown that none of the claims being presented by the Francik board were valid, and none of the claims being presented by the Francik board was a fraud of any form on the part of Walter Wagner or myself, and instead represented frauds or misrepresentations, or both, by the Francik board to that court (Mr. Nakamura).

11. Because this arrest of myself was clearly illegal (and apparently unprecedented in a civil trial), and specifically designed to prevent me from testifying as to the truth of the matters, Walter Wagner and I both filed a Notice of Appeal with the Hawaii intermediate court.

12. Initially, it appeared to be going well. Mr. Francik's attorney requested dismissal of the appeal, claiming it was not properly prepared. However, that request was properly opposed by us, and then denied by the appellate court. Subsequently, after about one year on appeal, the appellate court made the unusual request for copies of all of the transcripts of all proceedings, which neither Mr. Francik's attorney nor we had requested (the appellate court had all

9

of the written pleadings before them). Those transcripts simply bolstered our position, but we had not requested them initially because of the cost.

13.    However, after another year on appeal, the appellate court (actually, a three-person panel) abandoned the appeal, apparently when they realized that what we were complaining about was a collusion between the trial court judge and Mr. Francik in having me arrested at the "trial" without a legitimate basis. Consequently, all three of them self-recused themselves (no one asked for the recusal) from further hearing of the case. While it was assigned to another three-person panel, they quickly dismissed the appeal without deciding it, claiming that they couldn't understand what was being complained about. The Hawaii Supreme Court declined to review that. Consequently, even though fully briefed (Opening, Reply, Closing), the appeal was not decided on the merits of the collusion between the trial court judge and Mr. Francik, and instead dismissed.

14.    Likewise, there was not a valid trial in Nevada, and the claim from Nevada that Walter Wagner worked a fraud is not supported by the evidence that would have been presented had there been a valid trial.

15.    Initially, when WBGI via Mr. Francik filed their two cases (*WBGI v. Wagner*) in Hawaii and Nevada, they were essentially identical. We complained

10

to the Hawaii judge, Mr. Nakamura, that we should not have to proceed in both forums on identical suits. He fashioned an unusual remedy, instead of doing as we requested (dismissing one or the other suit). He directed that WBGI must agree to drop their claims for their allegations of monetary claims (the ones detailed above) in the Nevada suit and proceed only on the 'governance' claim as to whether Mr. Tolman or Mr. Francik should control WBGI. And he directed that the Hawaii suit would be the only forum for their monetary claims.

16.    Consequently, since I had no direct evidence on the Francik/Tolman dispute, only on the monetary claims, I did not fly to Nevada from Hawaii. Likewise, Mr. David Adams, who had been my office manager for David Adams and who would have corroborated my testimony about the office expenses, also did not fly to Nevada from Hawaii because he too was not involved in the Francik/Tolman dispute.

17.    However, when that case when to trial, Mr. Francik's attorney decided to slip in the false monetary claim that Walter Wagner had sold the company's treasury shares and embezzled the money. In fact, he had sold his own shares and donated the money to WBGI, though  the donation was administered by myself as I was keeping the books for the World Botanical Gardens Foundation, the non-profit that actually received the money. My testimony on that would

11

have been corroborated by Mr. Adams, as Mr. Adams was maintaining the WBGI records at that time and was continuously reducing Walter Wagner's share count as his shares were sold. It was very clear that he was selling his own shares, not the company treasury shares, but that was not what Mr. Francik told that Nevada judge – essentially lying to him about that. But since I wasn't there, having been deceived into not appearing, I couldn't set the judge straight.

18.    Because I was also a named defendant in those two fraudulently obtained judgments, I filed for bankruptcy protection several years ago, and they were discharged at that time.

DATED:    August 5, 2013

Linda M. Wagner

co-founder, WBGI

12

WALTER L. WAGNER
532 N 700 E
Payson, UT 84651
retlawdad@hotmail.com
808-443-6344

## IN THE UNITED STATES BANKRUPTCY COURT

## DISTRICT OF UTAH

--oo0oo--

| | |
|---|---|
| WORLD BOTANICAL GARDENS, INCORPORATED (WBGI), | A.P. No. 13-02099 (Bankruptcy No. 12-35494) |
| Plaintiff | **AFFIDAVIT OF WALTER L. WAGNER IN SUPPORT OF** |
| vs. | **MOTION FOR SUMMARY JUDGMENT AS AGAINST** |
| WALTER L. WAGNER, | **WBGI** |
| Defendant | |

## AFFIDAVIT OF WALTER L. WAGNER IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT AS AGAINST WBGI

I, Walter L. Wagner, affirm, state and declare, under penalty of perjury of the laws of the state of Utah, as follows:

1.    I incorporate by reference all of my previous affidavits filed herein as if they were set forth in full, and reaffirm their validity, and I summarize the facts they reference below.

2.    On August 28, 2013 I attended by telephonic conference a hearing in Reno Bankruptcy Court regarding WBGI's bankruptcy petition. At that hearing, a public auction was conducted for all of WBGI's assets. No bidders other than myself and WBGI's attorney, on behalf of a partnership between Steven Bryant and Mark Robinson (who also were WBGI's CEO and CFO, respectively), presented bids. My bid was rejected on the basis that the judgment I have pending against WBGI in Hawaii has not been perfected with a final judgment amount, and only cash bids were being accepted. At that hearing, all of the assets of WBGI were liquidated and transferred to that partnership of the former CEO and CFO of WBGI, and WBGI was thereby extinguished as a legal entity. Its "judgments" that are the subject of this action were assigned a valuation of $0.0

3.    I, along with my spouse Linda M. Wagner, founded a botanical garden in Hawaii in 1995, known as World Botanical Gardens, Inc. ("WBGI").

For ten years we served as the officers and directors of the corporation, through and until September 2, 2004. On September 2, 2004 we were replaced as the officers of WBGI, being replaced by Kenneth Francik ("Francik") as the new president, and Annette Emerson ("Emerson") as the new secretary and treasurer. Minutes of that board vote were prepared by Emerson. Emerson also submitted for filing on that date with the corporations department in Nevada (wherein WBGI was incorporated) showing that change in officers.

4.     During the course of the decade that I spent developing WBGI, I took it from a valuation of $0.0 and no land asset, to a valuation of $10,000,000 and 180 acres of fee-simple ownership, and an additional 90 acres of lease/purchase option. Approximately 650 shareholders invested approximately $4,000,000 in WBGI to support that. At the time that the new officers began taking over the reins (2005), WBGI additionally had approximately $500,000 cash in savings/checking, and a tourist-flow that paid its routine operating costs. In order to facilitate that development over those 10 years, I declined to accept my cash salary, and instead accepted promissory notes in lieu of payment of my earned salary. I additionally loaned approximately $70,000 to WBGI on my personal credit cards shortly after

3

9/11/2001 following a drastic downturn in Hawaii tourism that lasted nearly a year. All of the credit cards save one were used exclusively for WBGI loans.[1]

5.    In 2005, WBGI shareholder Ron Tolman ("Tolman") challenged the illegal hold-over of Francik as a WBGI officer and director. Circa April 2005 Tolman and Francik signed an agreement to share WBGI responsibilities, and to not use WBGI funds for litigation of this 'dispute'. Shortly thereafter, Francik removed the WBGI monies from the WBGI accounts, and then began using that money to sue Tolman, myself, et al. Two identical suits were filed in Hawaii and Utah, and falsely claimed that I had misused WBGI money during the preceding decade, and falsely claimed that Francik had been properly elected. In fact, he had received only 10% of the vote, giving rise to the dispute, and he did not have legal support by the shareholders.

6.    Over the course of the next several years, between 2005 and 2013, Francik and his associates liquidated all of the WBGI assets that I had acquired for the 650+ shareholders. This money was spent on Francik and his associates, including funding of his fraudulent lawsuits. The last remaining assets were recently liquidated with the bankruptcy dissolution of WBGI in

_____

[1] Those credit cards debts, on which Francik's board reneged on the repayment plan in place for several years, were included in my subsequent bankruptcy discharge entered by the court earlier this year, and were the bulk of items discharged except for the fraudulent judgments, which had a larger dollar amount on their face, though they were fraudulent.

August 2013 to 'satisfy' the alleged creditors (Francik and his associates). The botanical garden itself languished after 2005, as most of it was abandoned by Francik, and the tourist-flow fell from its high in 2004 of around 110 visitors/day, to about 15 visitors/day at the time of liquidation of the last remaining assets at auction in Reno during August 2013. This drop in visitor-flow was because of mismanagement, as the visitor flow to the Big Island has increased during that same time-frame.

7.    The two lawsuits filed by Francik, purportedly on behalf of WBGI, in Hawaii and Nevada are the subject of this summary judgment. Both suits resulted in fraudulently obtained 'judgments', and but for the fraud, no judgments would have issued as I was not engaged in any form of wrongdoing, and the allegations against me were frauds and lies.

8.    In support of the Hawaii action, in February 2008 Francik appeared before a Hilo grand jury and falsely alleged, with knowledge of the falsity, that Linda Wagner had signed, in January 2004, a WBGI promissory note when she was no longer a WBGI officer, falsely claiming she had been replaced by Emerson in August 2003, not in September 2004 as was actually the case. That grand jury issued the indictment he requested falsely charging Linda Wagner with attempted theft and identity theft, both felonies.

9.    Using this falsely obtained criminal indictment, Francik then secretly requested the trial court judge to arrest her at the "trial" of the case

5

being conducted in April 2008, falsely asserting to the judge that the indictment was valid. Acting on that misinformation, and contrary to accepted procedure, the trial court judge removed Linda Wagner from the courtroom at the start of the "trial" pursuant to Francik's fraudulently obtained indictment, thereby precluding her testimony as a former WBGI officer. Her testimony was to pertain to Francik's false allegations in the complaint during the time-frame when she served as a WBGI officer. The resulting judgment, issued without an actual trial, though rehearsing on its face as if a trial were conducted, has since been discharged, and bankruptcy-liquidated WBGI now seeks its re-instatement through the continuing action of *Richer and Overholt*.

10.    Her testimony, had she been allowed to testify, would have refuted all of his false allegations. Likewise, I left the courtroom to secure her release from false imprisonment, as it was pointless for me to continue the "trial" absent my key witness. The alleged "trial" was conducted entirely in our absence, and without any of our testimony that refuted all of the false allegations made against us. Consequently, there was no actual trial, and it was simply a one-sided presentation of Francik's numerous lies and frauds.

11.    The fact that Linda Wagner was a pillar[2] of the Big Island community, serving as a volunteer Relief Society President and other callings

---

[2] She currently has similar volunteer and professional callings in Utah.

for her Church, as a volunteer President of the local Parents and Teachers Association (PTA), as a professional educator in the local school district, and is a full-time Mom, was not presented to either the grand jury, nor to the trial court judge. Likewise, the fact that Francik was fired in 1995 from the Los Angeles Police Department ("LAPD") for presenting perjured testimonies, and that he was prosecuted for those felonies by the District Attorney for Los Angeles County, was also not presented to either the grand jury, or to the court. Rather, he falsely claimed he had voluntarily retired from the LAPD to both the grand jury, and to the court, in an effort to make himself appear credible to them.

12. The facts that Linda Wagner's testimony would have shown, had she been allowed to testify, and as would have been corroborated by my parallel testimony if I hadn't been required to post her bail, have been detailed by her sworn affidavit and my sworn affidavits and show:

- I did not sell company shares and fraudulently embezzle the money as falsely alleged by Francik, but rather sold some of my own shares, and donated the money to the garden;

- I did not fraudulently use company money to pay for my housing as falsely alleged by Francik, but rather my employment contract with WBGI included housing payment since I was not receiving my contracted salary but rather agreeing to accept promissory notes in lieu of salary;

- I did not fraudulently use company money to pay for personal legal work of no benefit to WBGI as falsely alleged by Francik, but rather I used

7

company money to pay WBGI attorneys for legal work that benefitted WBGI, at their urging;

- I did not fraudulently use company credit cards to purchase personal items, as falsely claimed by Francik, but rather I loaned my own personal credit cards to WBGI, one of which I also retained for personal use as well, and kept an itemized accounting for such personal purchases to insure WBGI did not inadvertently pay for those purchases;

- I did not fraudulently use company money to purchase health insurance for my family as falsely alleged by Francik, but rather my employment contract provided for health insurance for me and my family, as well as all other employees, as required by Hawaii law mandating health insurance for employees provided by the employer;

- I did not fraudulently loan company money to a third party, but such loan was approved by the board of directors and was for a legitimate WBGI purpose to further its interests in Hawaii;

- I did not engage in any other fraudulent activities that might be omitted herein as falsely alleged by Francik, but rather all of my activities were in furtherance of WBGI and increasing the WBGI asset base.

13.    The facts further show that no appeal of the above case was allowed, and instead after two years of pendency before the court of appeals, that appellate tribunal simply 'disqualified' itself by self-recusal of all three members in order to 'protect' the trial court judge for his obvious malfeasance, and shortly thereafter dismissed the appeal.

14.    In addition to the above uncontested facts showing no actual trial in Hawaii, and that the actual facts show no fraud whatsoever on my part but rather extreme fraud on the part of Francik, the uncontested facts show similar

8

fraudulent activity on the part of Francik occurred to obtain the "judgment" in Nevada.

15.   Specifically, the uncontested facts show that I was deceived by Francik into not having witnesses present in Nevada who would have had testimony pertaining to the falsely alleged fraud that I had sold company shares and embezzled the money.   Francik, by and through his Hawaii attorney, fraudulently deceived me and convinced me that monetary claims pertaining to that false claim would not be presented in Nevada, but only in Hawaii.   In reliance thereon, I did not fly my two primary witnesses pertaining thereto to Nevada.   The uncontested facts show that those witnesses were David Adams ("Adams") and Linda Wagner, who remained behind in Hawaii to give testimony pertaining to that false claim in the then forthcoming Hawaii case Francik had fraudulently initiated.   Francik fraudulently assured me that the Nevada case would only litigate the governance dispute between Tolman and Francik, not the monetary claims that were to be reserved exclusively for Hawaii.

16.   The uncontested facts show that Adams, had he been allowed to testify in Nevada, would have testified that I was selling my own shares and not the company shares as fraudulently alleged by Francik.   His testimony would have shown that he'd had several conversations with Francik regarding the fact that I was selling my own shares, that Francik knew of and approved

9

of such sales, and that Adams was routinely reducing my share count in the company data base to account for those share sales, and that I was not engaged in any form of fraud.

17.    The uncontested facts show that Linda Wagner, had she been allowed to testify, would have testified that I was selling my own shares and not the company shares as fraudulently claimed by Francik, that she kept the accounting thereof, and that the monies were donated to the betterment of the botanical garden by purchasing of materials, equipment and labor to support the garden effort, and that I was not engaged in any form of fraud.

18.    The uncontested facts show that, over the course of several years, Francik devastated the botanical garden finances by liquidating its assets which he then spent on himself, his associates, and his fraudulent lawsuits, and that he fraudulently sought to blame me for his own follies, and that consequently the new WBGI (with Steve Bryant as CEO and Mark Robinson, CFO) management was forced to file for bankruptcy liquidation last month.

19.    The facts further show, as in the Hawaii case, that there was no appeal right in Nevada and no ability to appeal erroneous findings of fact.

20.    In summary, the facts show that both judgments were obtained by the frauds of Kenneth Francik and his associates seeking to falsely obtain judgments against me, and that the lawsuits he filed was a fraudulent effort to prevent Ron Tolman from removing Francik from control of WBGI's finances.

10

21.    The lawsuits were not filed based upon a 'discovery' of any wrongdoing on my part, as the facts were known to Francik two years earlier when I shared all of the WBGI financial records with Francik and others in late 2003, and Francik did not file his lawsuits until late 2005, and only after Ron Tolman challenged his continuing "management" of WBGI which was recognized early-on as being potentially disastrous to WBGI and a cover for theft of WBGI's assets by Francik.

22.    Rather, the monetary claims in both suits were an amalgam of misrepresentations and frauds to designed to give the veneer of legitimacy to his lawsuits, and a claim that he had to "rescue" WBGI from its founder, who had built up its assets tremendously over ten years.

23.    Wherefore, it is respectfully requested that this court recognize that the frauds in this matter have been occasioned by the lying and deceit of Kenneth Francik, as detailed by my affidavits and the affidavits of others, and that I had not engaged in fraud, but rather have been a victim of fraud.

DATED:        August 31, 2013

Walter L. Wagner

11

WALTER L. WAGNER
532 N 700 E
Payson, UT 84651
retlawdad@hotmail.com
808-443-6344

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF UTAH

--oo0oo--

| | | |
|---|---|---|
| WORLD BOTANICAL GARDENS, | ) | Bankruptcy No. 12-35494 |
| INCORPORATED (WBGI), | ) | A.P. No. 13-02099 |
| | ) | |
| Plaintiff | ) | **AFFIDAVIT OF DAN PERKINS** |
| | ) | **IN SUPPORT OF MOTION** |
| vs. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | **AS AGAINST WBGI** |
| WALTER L. WAGNER, | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT OF DAN PERKINS IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT AS AGAINST WBGI

I, Dan Perkins, affirm, state and declare under penalty of perjury of the laws of the state of Utah as follows:

1.  Attached herewith is a copy of my sworn affidavit in *Wagner v. Michie* currently pending in court. I wish to add to that affidavit, which I incorporate herewith as part of this affidavit, with the following additional comments.

2.  I am a father, grandfather and great-grandfather, and have had many business experiences over many decades. I have never before met someone as deceitful and fraudulent as Kenneth Francik (Francik). I know this from my own personal experiences with him. I first had dealings with him in 1999 in signing him up with WBGI, and have learned about his mis-deeds with WBGI.

3.  I first learned about his trickery and deceit in early 2005. In 2004 I was on the board of directors for the botanical garden with him, and he convinced me we needed new corporate officers, and that with him and Annette Emerson as officers, WBGI would take off and become hugely successful. I thought that would happen, and so on September 2, 2004 we conducted a telephone board meeting, and I voted along with the other board members to replace Walter and Linda Wagner as the WBGI officers with Ken Francik and Annette

2

Emerson replacing the Wagners. This was described in more detail in my attached affidavit. But that was not the trickery of which I write.

4.     Also in September 2004, about 3 weeks after our telephone board meeting removing the Wagners as the WBGI officers, I personally met with Francik at the WBGI garden site, a few minutes before the start of the annual shareholder meeting. Mr. David Adams also attended, and the three of us discussed the fact that Walter Wagner (Wagner) was selling some of his share ownership in WBGI. This had been approved two months earlier by our board, and I was already aware of that fact.

5.     During the discussion, Francik voiced the opinion that he thought it was a good idea that Wagner was selling some of his own share ownership, because he said it was reducing his share count, and he apparently did not like the fact that Wagner owned about 17% of the company, while he had paid about $100,000 for only 1% ownership. This discussion lasted about 5 minutes, and I did not think much about it at the time, though I mentioned it to Wagner.

6.     However, several months later we were having another telephone board meeting in late January 2005 (or early February, I don't recall exactly the date). During that meeting Francik announced to the board members that he had 'caught' Wagner selling the company treasury shares and embezzling the money. He mentioned nothing about the fact that Wagner was selling his own

3

shares, with the permission he had been granted by the earlier board (from before the September 2004 'election'). He said he'd obtained copies of the sales documents during an "audit" of the WBGI office by Leslie Cobos (who was his ladyfriend at the time).

7.    Apparently, he was expecting me to go along with that clear fraud and lie. I refused, and instead I quit his board in disgust. I telephoned Wagner only minutes after that board meeting and told him the lie that Francik was telling his board members about him, apparently attempting to set Wagner up for a false embezzlement charge. Wagner asked me to write down the meeting I'd had with Francik several months earlier in which Francik had expressed pleasure with the knowledge that Wagner was selling some of his own shares, which I did, and it has been written about previously in other court pleadings I've filed.

8.    I telephoned David Adams (who had been at that earlier meeting, but was no longer on the Francik board) to discuss this development. He informed me (which he has also written about in several sworn affidavits filed in previous legal pleadings) that Leslie Cobos had not conducted an audit to find those share-sale documents for Wagner's shares. Rather, she had simply walked into the WBGI office for which Mr. Adams served as the office manager, and asked for copies of the share-sale documents Wagner had been presenting to

4

Mr. Adams whenever Wagner made share sales. Suspecting nothing, Mr. Adams provided them to her (as she was on the WBGI board).

9.     Mr. Adams had been regularly decreasing Wagner's share count in the company data-base for those share sales Wagner had been making. He had discussed that several times with Francik according to his sworn affidavits. But Francik made no mention of that fact to the new board either. Rather he made it appear that Wagner was selling the treasury shares and embezzling the money, when Francik was well aware that Wagner was simply selling his own shares, with Francik's and the previous board's prior approval.

10.    This was the first time I learned of Francik's deviousness. I subsequently learned that not only does he lie, he is willing to lie under oath in order to cause people harm, as he subsequently did with Wagner in illegally getting Wagner's wife arrested, as detailed in my attached affidavit.

11.    Apparently, because Mr. Adams, Wagner and I all wrote detailed affidavits about Francik's prior knowledge about Wagner's share sales, Francik did not attempt to bring fraudulent criminal embezzlement charges against Wagner, and instead took the tact of bringing fraudulent criminal 'attempted theft' charges against Walter Wagner and Linda Wagner for their supposedly signing a promissory note in January 2004 when, according to Francik's lies, they were no longer WBGI officers.

12. However, as is detailed in my attached affidavit from two years ago, both Wagners were WBGI officers at that time when they signed that last Promissory Note, as was well known to Francik, who simply lied about that fact. Apparently, he was unaware of the extensive written documentation that Wagner would be able to muster to refute that lie, and believed instead that it would be simply Wagner's word against that of Francik, and Annette Emerson who apparently goes along with his lies, as she is apparently intimidated by him, and much younger.

13. Even though Francik did not initiate fraudulent criminal embezzlement charges against Wagner, he included those falsified fabrications of 'embezzlement' in the phony civil suit he filed against Ron Tolman, Wagner, myself and others. That was the 'basis' for the phony monetary judgment in Nevada, Francik's fabricated claim that Wagner sold the company treasury shares and 'pocketed the money' (the terminology that Francik uses), when the truth was that Wagner sold a few of his own shares (which was allowed by the previous board, and that was his property to sell).

14. That phony charge of embezzlement was also contained in the phony judgment from Hawaii when Linda Wagner was arrested based on Francik's lies, and prevented from giving testimony about Francik's frauds. Moreover, Wagner donated that money to a foundation, which used it to better the

6

garden, which Linda Wagner has also attested to. The actual embezzlements

that were going on are the embezzlements of the Visitor Center monies (about

$200,000) by the Francik board, the sale of WBGI lands and embezzlement of

that money cashed out from the WBGI land equity, and all of the other frauds

being committed by the Francik board that have now bankrupted WBGI.

15.    I find it absolutely reprehensible that Francik and his associates are still

continuing to hound Wagner with their false claims, seeking to "recover"

monies (Francik's term of 'art') that Wagner never obtained. Rather, Francik's

false fabrications that Wagner "misappropriated" WBGI monies while serving

as WBGI's President are simply that - - false fabrications. Wagner was not

able to refute them in court in Hawaii because of Francik's sinister effort to

have Linda Wagner removed from the courtroom, and Wagner went to post her

bail because his chief witness was no longer available.

16.    I have read the summary of Francik's false fabrications presented by

both Wagners, and that is correct. I visited at the Wagner residence in Hawaii

on an annual basis when I came for the annual shareholder meetings. They

lived a very frugal lifestyle, in a very modest home, with no evidence of

misappropriation of monies. Further, Wagner worked long hours on a daily

basis, as I could tell from the changes taking place at the garden year to year.

He did not collect his salary, which fact I used as a selling-point for new

7

investors. Rather, he simply received housing (which doubled as an office, nursery, and tool-storage yard) paid by the garden, medical insurance paid by the garden, and that's about it in terms of compensation to Wagner.

17.    Francik twisted those facts at the phony Hawaii "trial" by claiming payment for housing and medical insurance was "misappropriation" when in fact it was properly appropriated and approved, and so far as I can tell perfectly legal to do in light of the fact that Wagner was not receiving his cash salary but taking promissory notes instead so that he could spend that money on developing the garden instead. Likewise, the appropriation to pay money to attorneys was approved by those attorneys and by the WBGI board, and did not enrich Wagner in the least. Francik, however, long after-the-fact, claimed those expenditures for legitimate attorney services were "misappropriations" as well. In actuality, the money being misappropriated for attorneys is the money Francik is appropriating nowadays for his fraudulent lawsuits against Wagner. Those Francik misappropriations have bankrupted WBGI, as they exceed $800,000 which is a huge sum for a small company.

18.    As also detailed by Linda Wagner in her affidavit, the Nevada trial was supposed to be limited to only the 'governance' claim involving the dispute between Ron Tolman and Francik. Neither Linda Wagner nor David Adams appeared at that trial because they did not have information regarding that

8

governance dispute. However, Francik and his attorneys presented at that trial that false claim that Wagner sold the company treasury shares and embezzled the money, even though they had earlier promised that monetary claims would not be presented in Nevada, but rather only in Hawaii.

19.    Not only was that not true as I wrote above, but it was difficult to refute with Francik lying in court, and Wagner not having his witnesses available for that (David Adams and Linda Wagner, as David had testimony that Wagner was selling his own shares and having his share count reduced; and Linda had the same testimony, and that she herself was spending the money on improving the garden via the foundation for which she did the administration). Again, there was zero fraud on the part of Wagner, and the fraud was Francik's deceiving Wagner into not bringing his witnesses to Nevada from Hawaii by Francik agreeing to not make monetary claims there, and then making that phony monetary claim that he also made in Hawaii of Wagner purportedly selling company shares, not his own, and embezzling the money.

20.    What is the great irony in all of this is that the continuing phony claims of fraud on Wagner's part for falsely alleged "misappropriation" is in fact a misappropriation of the WBGI shareholder money being used to fund that continuing fraud, now being continued in this Court. **That** appropriation (an actual misappropriation) has now bankrupted WBGI. This Court should simply

9

reject those fraudulent claims, dismiss the phony fraudulent complaint against Wagner, and award him his costs or attorney's fees for defending against yet again another of Francik's and his board's frauds.

DATED: August 16, 2013

Dan Perkins

8/16/2013

NOTARY PUBLIC
Walter Uscategui
657707
My Commission Expires
October 22, 2016
STATE OF UTAH

# ATTACHMENT "A"
**Affidavit of Dan Perkins in *Wagner v. WBGI*, Utah**

WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

FILED
U.S. DISTRICT COURT

2011 NOV -7 P 1: 08

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK


# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| WALTER L. WAGNER, | Case:   2:11cv00784 |
| | |
| Plaintiff | **AFFIDAVIT OF DAN PERKINS** |
| | **IN SUPPORT OF MOTION** |
| vs. | **FOR PRELIMINARY** |
| | **INJUNCTIVE RELIEF** |
| PRESTON MICHIE, KENNETH | |
| FRANCIK, LESLIE COBOS, MARK | |
| ROBINSON, ANNETTE EMERSON | |
| STEVE BRYANT, WORLD BOTANICAL ) | Hon. Brooke C. Wells |
| GARDENS, INC. (WBGI), | |
| | |
| Defendants | |
| | |


## AFFIDAVIT OF DAN PERKINS IN SUPPORT OF MOTION FOR
## PRELIMINARY INJUNCTIVE RELIEF

I, Dan Perkins, affirm state and declare under penalty of perjury of the laws of the State of Utah as follows:

1.    I am over the age of eighteen and not a party to this action.

2.    I have known plaintiff Walter L. Wagner since circa 1991, and I have worked professionally on numerous projects with him, including but not limited to the 2010 US Census; 2009, 2010 and 2011 CMS Medicare Insurance; numerous Oil & Gas drilling ventures; and the World Botanical Gardens that he founded.

## Fraudulent Indictment

3.    I began working with plaintiff on the World Botanical Gardens in late 1995, about one year after he founded the project along with Cal Andrus, and am intimately familiar with the facts herein. My role was primarily to locate investors for the project, and assist them in investing.

4.    In that capacity, I assisted defendant Kenneth Francik in becoming an investor in WBGI circa 1999.

5.    Walter Wagner was the President and Founder of WBGI, and retained that capacity as President until September 2, 2004.    His wife was the Secretary/Treasurer of WBGI, also until September 2, 2004.    On September 2, 2004 defendant Francik telephoned me and we conducted a WBG Board Meeting (he had been appointed to the Board several months earlier) with the

two of us and the other board members on a joint conference call, excluding

solely Walter Wagner who was not invited. At that telephone board meeting, we

voted to remove the Wagners as the corporate officers, and replace them with

defendant Francik and defendant Annette Emerson. Defendant Emerson was

instructed to file the appropriate paperwork with the State of Nevada, which she

did later that day.

6.    I am familiar with the fact that defendant Francik appeared before the Hilo

grand jury in February 2008 and gave testimony, in that I have read the

transcript of that testimony. The gist of his testimony was that the Wagners

were not WBGI officers on January 1, 2004 when they signed a WBGI

promissory note as WBGI officers, having purportedly been replaced in 2003 as

the WBGI officers by defendants Emerson and Francik and that accordingly

they engaged in "attempted theft" and "identity theft". His testimony was a

complete lie.

7.    It was well known to defendant Francik that the board voted to remove the

Wagners as the WBGI corporate officers in September 2004 some eight months

after they signed that promissory note, NOT in 2003 before they signed that

promissory note. This effort to backdate when defendants Francik and

Emerson became WBGI officers by a full year, replacing the Wagners, was a

complete fraud on the Hilo grand jury. Unfortunately, defendant Francik was the

only person to give testimony about that, and based on his lies they issued an indictment against the Wagners.

8.    I am familiar with the subsequent use to which Francik put that fraudulently obtained indictment. I was also named as a defendant in that civil action that Francik initiated, via WBGI, against the Wagners, and the Wagners and I were scheduled to appear at a trial therein circa April 2008, some two months after that indictment was issued (February 2008). The Wagners had been allowed to remain free at pre-trial hearings by the trial court judge (who had issued a warrant the following day, based on that indictment), but when they appeared at the "trial", the judge in collusion with defendant Francik had the Wagners arrested. I was not present at the "trial", as I had expected that the Wagners would provide evidence and testimony in opposition to the fraudulent civil charges lodged against us, but that did not happen because the Wagners were instead at the jailhouse. I know these facts because I have read the sworn testimonies of the Wagners pertaining to them. Because the Wagners could not give evidence and testimony in opposition to the fraudulent testimonies of Kenneth Francik and Annette Emerson who were present at the "trial", a judgment was issued against them and me.    When those facts were subsequently presented to that judge, he nonetheless denied a new trial. That civil case judgment is currently pending before the Hawaii appellate system.

9.    I am also familiar with the fact that one or more defendants placed that
fraudulently obtained "indictment" on the WBGI webpage for shareholders,
which I saw when I accessed that webpage, and that that document was
present until at least about the time of the filing of the complaint in this matter,
more than one year after the "indictment" was dismissed.

10.    Not only is that "indictment" a fraud, and falsely impugns the character of
the Wagners, such documents have no valid basis for being on a business
website as it does not pertain to the ongoing business of WBGI. It appears to
have been placed there solely to malign the Wagners in an effort to wrongly
convince the shareholders that the defendants are properly exercising control of
the corporation, when in fact their 'control' has been disastrous to the
shareholders.

## Theft of Visitor Center Monies

11.    I am familiar with the facts surrounding the theft of the Visitor Center
monies. I was assisting WBGI in raising those funds that were to be dedicated
for construction of a Visitor Center, and had spoken with all of those investors at
one time or another. I was informed that approximately $220,000 was placed
into a dedicated Visitor Center account in 2004 from our existing investors.
Unlike other monies I raised from new investors, for which I was paid a small

commission, I was paid no commission on those monies that came from existing investors.

12.    In 2005, one of the WBGI shareholders, Mr. Ron Tolman, became concerned about the illegalities of Kenneth Francik, and sought to correct that situation.    He and Kenneth Francik, in conjunction with defendant Preston Michie, subsequently signed in 2005 an agreement that no WBGI monies would be used for litigation of their disagreements. I have been informed and believe, and on such information and belief allege, that shortly after signing that agreement defendant Francik and others began stealing the Visitor Center funds, which they then used for litigation against the Wagners, Mr. Tolman, myself and others, including the litigation resulting in the phony "trial" of 2008 in which defendant Francik had the Wagners illegally arrested based on his phony "indictment".

13.    At no time did Walter Wagner have control over those Visitor Center funds, but instead the board and officers had control over those funds, which WBGI officers at that time were defendants Francik and Emerson. I resigned that board in January 2005 when I learned of defendant Francik's illegal activities, and at that time the Visitor Center funds were intact.    Defendants Francik, Michie, and Emerson remained on that board when I resigned.

Case 2:11-cv-00784-RJS   Document 3   Filed 11/07/11   Page 7 of 9

14.   I have read the email exchange between Louis Pratt and defendant
Preston Michie.  In that exchange, defendant Michie asserts to Mr. Pratt that
there was never a Visitor Center account and that the 'reason' the Visitor Center
was not built was because plaintiff Wagner had stolen the Visitor Center
monies.  That is a complete lie.  There was indeed a dedicated Visitor Center
account with about $220,000 in it when I was on the board in January 2005
some five months after the Wagners were removed as corporate officers.  The
fact is those monies were stolen sometime after I quit that board, and NOT by
the Wagners who had not been on the board for some time.  That is the reason
the Visitor Center was not built, not because plaintiff Wagner stole those Visitor
Center monies as falsely claimed by defendant Michie, which he did not, but
because one or more of the defendants herein stole those monies.  Defendants
are simply attempting to cover up that theft of Visitor Center monies by falsely
blaming plaintiff Wagner for that theft, when they are the responsible
(irresponsible?) parties.

## Mismanagement of Corporate Database

15.   I was kept apprised of the WBGI database of shareholders by plaintiff
Wagner, and viewed the complete database from time to time.  He was keeping
good records.   In Janaury 2005 Mr. David Adams printed out the WBGI

corporate database, which I have seen, and it included two early shareholders, namely Cal Andrus and Milton Lunt.

16.    I have read the email exchanges sent by defendant Steve Bryant in which he falsely claims that both Cal Andrus and Milton Lunt were not included in the WBGI database because of mismanagement on the part of plaintiff Wagner. In fact, the mismanagement is on the part of one or more defendants herein, as both of those shareholders were included in the database maintained by plaintiff Wagner through and until January 2005, but subsequently deleted from the database by one or more of the defendants.

17.    This false blaming of plaintiff Wagner for the misdeeds of the defendants appears to be part of a systematic maligning of him for their own wrongdoings, and has no basis as a part of a legitimate business venture.

#### Conclusion

18.    I will be available to provide oral testimony pertaining to these facts at the hearing of this motion. In my opinion, this Court should order the removal of all the fraudulently obtained 'legal documents' from the shareholder section of the WBGI website. These are extremely false and damaging to plaintiff, and have no rationale basis to be included on a business website. Further, because they have been posted for quite some time, this Court should likewise order the

placement of some type of 'corrective' that would serve as a notice to the WBGI
shareholders that they have been deceived.

19.    In my opinion, this Court should also conduct a hearing into the theft of the
Visitor Center monies, and remove from WBGI management those parties
found responsible.

DATED:    November 7, 2011

Dan Perkins

## CERTIFICATE OF COMPLIANCE

I CERTIFY THAT THE FOREGOING *REPLY TO APPELLEE BRIEF*, EXCLUDING ITS *COVER PAGE*, *TABLE OF CONTENTS*, *TABLE OF CASES*, *STATEMENT OF PRIOR OR RELATED CASES*, AND THIS *CERTIFICATE OF COMPLIANCE,* HAS TYPE-FACE OF 14 POINTS, AND ITS WORD COUNT INCLUDING FOOTNOTES IS LESS THAN 7,000 AS COMPUTED BY THE WORD PROCESSING PROGRAM USED TO GENERATE THE DOCUMENT.

WALTER L. WAGNER

WALTER L. WAGNER
532 N 700 E
Payson, Utah 84651
retlawdad@hotmail.com
808-443-6344

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| WALTER L. WAGNER, | ) |
| | ) Case No. 13-4082 |
| Appellant and Plaintiff | ) |
| | ) (Dist No. 2:11cv00784; Utah) |
| vs. | ) |
| | ) **CERTIFICATE OF SERVICE** |
| PRESTON MICHIE, KENNETH | ) |
| FRANCIK, LESLIE COBOS, MARK | ) (Appeal from decision of US |
| ROBINSON, ANNETTE EMERSON | ) District Judge Robert J. Shelby) |
| STEVE BRYANT, WORLD BOTANICAL ) | |
| GARDENS, INC. (WBGI), | ) |
| | ) |
| Appellees and Defendants | ) |

I certify that I served the *Reply to Appellee Brief* on Arnold Richer, 901 W. Baxter Drive, South Jordan, UT 84095 by mailing him 2 copies on today's date.

DATED:    September 26, 2013

Walter L. Wagner